CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
February 06, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| Eco Cladding, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:25-cv-00068 |
| | ) | |
| Hohmann & Barnard, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Rainscreen support brackets are nestled inside the walls of buildings across the world. These small metal brackets secure rail systems designed to create a crucial air cavity between a building's main wall and its cladding—the non-structural protective layer on the exterior of the building. Plaintiff ECO Cladding, Inc. ("ECO") designed a new type of rainscreen support bracket then shared the designs with Defendant Hohmann & Barnard, Inc. ("H&B") for an evaluation of manufacturing feasibility and costs pursuant to a non-disclosure agreement. Almost two years later, the parties signed a supply agreement apparently intended to accelerate ECO's plans to bring the product to market. When ECO discovered that H&B was marketing a new product that looked exactly like the designs created by ECO, their relationship soured. ECO sued H&B in state court, alleging that H&B misappropriated and improperly disclosed ECO's confidential information. H&B removed the action to this court and now moves to dismiss ECO's complaint. (Dkt. 13.) For the reasons stated below, the court will grant the motion in part and deny in part.

I.  Background[1]

ECO provides a variety of design, engineering, and installation services for cladding support systems used in commercial construction. (Compl. ¶ 1 (Dkt. 1-2).). Similarly, H&B designs and produces various commercial construction support systems. (*Id.* ¶ 2.) In 2021, ECO was developing a new design for a rainscreen support bracket ("New Product Design"), which was unique in the market at the time. (*Id.* ¶ 5.) ECO believed H&B's manufacturing prowess "could be beneficial for the potential manufacture of ECO's New Product Design," so the parties began to discuss potential partnerships. (*Id.* ¶¶ 7–8.) H&B assured ECO that it would not misappropriate ECO's new design, and that it was not interested in bringing a similar bracket to market. (*Id.* ¶ 9.) To appease any concerns, H&B showed ECO their current rainscreen support system, which used a "markedly different" bracket. (*Id.* ¶¶ 10–12.)

Relying on these assurances, ECO agreed to enter into a Mutual Confidentiality and Non-Disclosure Agreement ("the NDA") with H&B, effective October 22, 2021. (*Id.* ¶ 13; Mutual Confidentiality & Non-Disclosure Agreement (Dkt. 1-2 at 16–20) [hereinafter "NDA"]). The purpose of the NDA was to allow H&B to give ECO feedback on the feasibility of and costs involved in manufacturing ECO's new design and to provide the foundation for a potential manufacturing agreement in the future, all while keeping ECO's design confidential. (Compl. ¶ 13.) By signing the NDA, H&B agreed to restrict the disclosure or use of any confidential information to purposes "in accordance with" or "as required to accomplish the intent" of the agreement. (*Id.* ¶ 15.) Additionally, the NDA stated that any

---

[1] The facts are taken from Plaintiffs' complaint and are accepted as true when addressing a motion to dismiss. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

"improvements to or further developments of [ECO's] intellectual property" enabled by the disclosure of the confidential information would be "the sole property" of ECO and could not be "further developed, disclosed or commercialized without [ECO's] written consent." (*Id.* ¶ 16.)  ECO relied on the terms of the NDA and disclosed its New Product Design and other related confidential information to H&B, including testing results, design files, and engineering calculations.  (*Id.* ¶ 17.)

As it had hoped, ECO received feedback from H&B on manufacturing and continued to improve its New Product Design.  (*Id.* ¶ 18.)  Feeling confident about the partnership, ECO entered into a written Supply Agreement with H&B effective August 25, 2023.  (*Id.* ¶ 19; Supply Agreement (Dkt. 1-2 at 21–27).)  Under the Supply Agreement, H&B agreed to manufacture ECO's new design exclusively for ECO.  (Compl. ¶ 21.)  According to ECO, H&B also agreed to develop a tooling product called a "progressive die," which would decrease manufacturing costs and help ECO bring its product to market more quickly and cost-efficiently.  (*Id.* ¶¶ 21-23.)  After it was developed by H&B, the progressive die would become ECO's sole property.  (*Id.* ¶ 21.)

At some time after the parties signed the Supply Agreement, ECO learned that H&B was advertising—as its own product—a new rainscreen support bracket that "contained the same distinct elements" as ECO's New Product Design.  (*Id.* ¶¶ 26–30, 32.)  The product, according to ECO, "contains only minimal (and superfluous) changes from ECO's New Product Design." (*Id.* ¶ 32.)  ECO also discovered that H&B had applied for a patent related to this product in September 2022, which was published to the public in March 2024.  (*Id.* ¶¶ 33–35.)  ECO is confident that H&B had not developed the design for this new bracket prior

- 3 -

to receiving ECO's confidential designs pursuant to the NDA, (*id.* ¶ 31), and claims that all of H&B's actions related to the rainscreen bracket were made without ECO's consent or authorization, (*id.* ¶ 37). On top of this, H&B never developed or provided the progressive die to ECO, which "slowed ECO's entry into the market and prevented ECO from timely creating a cost-effective manufacturing process for the New Product Design." (*Id.* ¶¶ 24–25.)

ECO sued H&B in the Circuit Court for the City of Winchester, Virginia on May 27, 2025, alleging that H&B breached the NDA (Count I) and the Supply Agreement (Count II), unlawfully converted ECO's New Product Design and confidential information (Count III), and fraudulently induced ECO to enter into the NDA and the Supply Agreement (Count IV). (Compl. ¶¶ 38–68.) H&B removed the action to this court on July 11, 2025, (Dkt. 1), and moved to dismiss ECO's complaint on August 18, 2025, (Dkt. 13). ECO filed its opposition brief two weeks later, (Pl.'s Br. in Opp. to Def.'s Mot. to Dismiss (Dkt. 15) [hereinafter "Pl.'s Resp."]), and H&B replied one week after that, (Def.'s Reply in Supp. of Mot. to Dismiss Pl.'s Compl. (Dkt. 16) [hereinafter "Def.'s Reply"]).

## II.    Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing*, 959 F.3d at 616.

### III. Analysis

ECO's complaint includes four claims under state law: two breach of contract claims and two tort claims. (*See* Compl. ¶¶ 38-68.) The choice of law rules of the forum state—in this case, Virginia—apply to federal courts sitting in diversity. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir. 1999). Both applicable contracts, the NDA and the Supply Agreement, contain choice-of-law provisions, which are generally recognized and enforced in Virgina. (NDA ¶ 13; Supply Agreement ¶ 16; *Signet Bank*, 166 F.3d at 624.) Accordingly, the court will apply Delaware law to Count I and New York law to Count II.

To determine the applicable substantive law in tort suits, Virginia courts apply the principle of *lex loci delicti*; the law of the place where the injury occurred governs. *Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 273 (4th Cir. 2015). Although ECO does not allege the location of the injury, the parties apply Virginia law to Counts III and IV, (*See* Def.'s Mem. in Supp. of Mot. to Dismiss Pl.'s Compl. at 11 (Dkt. 14) [hereinafter "Def.'s Br."]; Pl.'s Resp. at 6–9), and the court will do the same. *See, e.g., Gilmore v. Jones*, 370 F.Supp.3d 630, 663 n.36 (W.D. Va. 2019) (construing citations of Virginia law to imply consent to apply Virginia law); *Terracino v. Trimaco, Inc.*, 2023 WL 2656753, at *3 n.4 (E.D.N.C. Mar. 27, 2023) (explaining that

for tort claims, "[w]here plaintiffs do not assert *lex loci*, and both parties brief as though" a particular state's law applies, the court applies that state's law).

Because ECO attached the NDA and the Supply Agreement to its complaint as exhibits, the court considers them as part of the pleadings at the motion to dismiss. *See* Fed. R. Civ. P. 10(c).

### A. Breach of Contract: Non-Disclosure Agreement (Count I)

ECO alleges that H&B breached the NDA by wrongfully taking, retaining, using, and disclosing ECO's confidential information. (Compl. ¶¶ 43–44.) The NDA states that it "shall be construed in accordance with the laws of the State of Delaware." (NDA ¶ 13.)

To establish a breach of contract under Delaware law, ECO must show: "(1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages." *Vermeer v. Univ. of Del.*, 710 F.Supp.3d 401, 409 (D. Del. 2024) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)). The parties do not dispute that the NDA was a valid contract or that ECO has sufficiently alleged damages.

H&B argues that Delaware law requires heightened specificity from plaintiffs when pleading a breach of non-disclosure agreements. (*See* Def.'s Br. at 12–13.) In support, H&B cites one Delaware case, *Akzo Nobel Coatings Inc. v. Dow Chemical Co.* (*See id.* at 12, 14 (citing No. 8666-VCP, 2015 WL 3536151, at *8 (Del. Ch. June 5, 2015)).) But *Akzo* rejects an essentially equivalent argument put forward by the defendant in that case. *See Akzo*, 2015 WL 3536151, at *8 ("[Defendant] Dow appears to be invoking a heightened pleading standard . . . . But, there is no requirement that improper disclosure of confidential

information be pled with particularity.") H&B's numerous citations to non-Delaware case law do not convince the court that such a standard applies in Delaware.

Although ECO does not have to plead a breach of NDA with particularity, it still must allege sufficient facts to plausibly demonstrate that the NDA obligated H&B not to share confidential information and that H&B breached this obligation. *See Hydrogen Master Rights, Ltd. v. Weston*, 228 F.Supp.3d 320, 333 (D. Del. 2017) (explaining the standard). And in doing so, ECO must at least identify the provisions of the NDA that were breached. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006) (finding plaintiff failed to state a claim because it "ha[d] not identified any express contract provision that was breached" nor "identified any implied contract term that it would have the trial court read into the contract"); *Travelers Cas. & Sur. Co. of Am. v. Blackbaud, Inc.*, No. N22C-12-130, 2024 WL 1298762, at *9 (Del. Super. Mar. 27, 2024) ("A party must identify the particular contractual terms that were breached").

While ECO's complaint does not directly identify breached contractual provisions in the NDA by paragraph number, it alleges specific contractual duties for H&B under the NDA—for example, to "maintain the secrecy of ECO's confidential information" and to use the confidential information only to accomplish the intent of the NDA—and that H&B breached those duties.[2] (*See* Compl. ¶¶ 15–16, 41–42.) ECO alleges that it shared its "New Product Design, the testing, design files, engineering calculations, and associated information" with H&B pursuant to the NDA, and that H&B "improperly and publicly disclosed,"

---

[2] ECO identifies specific provisions that were allegedly breached by paragraph number in its opposition brief. (*See* Pl.'s Resp. at 2–3.) But ECO cannot supplement the complaint through its briefing. *Tornetta v. Musk*, 250 A.3d 793, 806 n.89 (Del. Ch. 2019).

"misappropriated," and used that information for its own economic advantage. (*Id.* ¶¶ 40, 43.) Although the complaint does not specifically point to paragraphs in the NDA that were violated, ECO's allegations reasonably describe those obligations in the NDA that were violated. (*See* NDA ¶¶ 2, 3, 6, 9.) Drawing all reasonable inferences in ECO's favor, the court finds that is enough at this stage; ECO's allegations put H&B on sufficient notice of the allegations against it. *See, e.g.*, *Akzo*, 2015 WL 3536151, at *9 (finding that Plaintiff's allegations that Defendant disclosed categories of confidential information "in violation of the confidentiality provisions" in the relevant agreement "adequately place[d] [Defendant] on notice of the claims against it").

H&B also argues that much, if not all the information that ECO claims was confidential had been publicly known before the NDA was signed. (*See* Def.'s Br. at 14.) That may be true. But the court is obligated to take ECO's assertions in the complaint as true at the motion to dismiss stage. *See Kerns v. United States,* 585 F.3d 187, 192 (4th Cir. 2009). Any factual disputes over what information was publicly known and therefore not covered by the NDA are not appropriate to resolve at this stage of litigation. Accordingly, the court finds that ECO sufficiently stated a plausible claim that H&B breached the NDA.

### B. Breach of Contract: Supply Agreement (Count II)

ECO alleges that H&B breached the Supply Agreement by failing to create and provide a progressive die to ECO. (Compl. ¶ 49.) The parties do not dispute the choice of law provision in the Supply Agreement, which states that the agreement will be "governed, construed, and interpreted in accordance with the laws and decisions of the State of New

York." (Supply Agreement ¶ 16.) The court will apply New York law in evaluating Count II. *Signet Bank*, 166 F.3d at 624.

To establish a breach of contract under New York law, ECO must successfully plead: (1) that a contract exists between the parties; (2) that ECO has performed its obligations under the contract; (3) that H&B failed to perform its obligations under the contract; and (4) that ECO was damaged by H&B's failure to perform. *See Markatos v. Citibank*, 760 F.Supp.3d 70, 84 (S.D.N.Y. 2024); *E. Materials Corp. v. Mitsubishi Plastics Composites Am., Inc.*, 307 F.Supp.3d 52, 58 (E.D.N.Y. 2018). The parties do not dispute that the Supply Agreement is a valid contract, but H&B argues that the agreement did not require it to create or provide a progressive die. (Def.'s Br. at 15.)

Under New York law, the interpretation of a contract is a matter of law for the court to decide. *805 Third Ave. Co. v. M.W. Realty Assocs.*, 448 N.E.2d 445, 447–48 (N.Y. 1983). Here, the relevant section of the Supply Agreement provides:

> 11. <u>Tooling</u>. Upon payment in full in accordance with the payment terms described on <u>Schedule B</u>, the tooling described on <u>Schedule B</u> ("Buyer Tooling") will be owned by Buyer. After termination of this Agreement, Buyer may use the Buyer Tooling to manufacture any products including the Exclusive Goods. Seller agrees Buyer may do so without further compensation to Seller.
>
> . . .
>
> **Schedule B**:
> Generic Tooling Description
> Progressive die to stamp 4" – 8" Eco Cladding brackets to meet specs.
> Cost - $45,000 - To be paid over 12 monthly installments.

(Supply Agreement ¶ 11, Schedule B.) These provisions are the only references to the progressive die in the Supply Agreement. And they do not include an express obligation for

H&B to create a progressive die nor provide it to ECO. The terms only provide that ECO will own the die after they have paid H&B in full for it.

Nevertheless, ECO argues that "the parties' agreement is not unclear. H&B had a duty to develop and deliver the tooling. That development never occurred." (Pl.'s Resp. at 5.) To the extent that ECO intends to argue that such a duty was implied by the contract, it has not alleged sufficient facts to support that theory. ECO alleges that "H&B induced ECO to enter into the supply agreement by promising to create and provide a progressive die to ECO," but never that this promise was memorialized in the Supply Agreement itself.[3] (Compl. ¶ 48.) Elsewhere in the agreement, H&B agrees to "manufacture and sell" the goods listed in Schedule A to ECO. (Supply Agreement ¶ 1.) The presence of these terms for the Schedule A goods leaves the court with the "necessary inference" that the omission of the same terms for the Schedule B goods (the progressive die) was intentional. *See Sharkey v. Zimmer USA, Inc.*, No. 20 Civ. 8258, 2021 WL 3501160, at *6 (S.D.N.Y. Aug. 9, 2021); *see also Novella v. Westchester Cnty.*, 611 F.3d 128, 142 (2d Cir. 2011) (explaining that the presence of a contractual provision applicable to one type of pension "makes clear" that the omission of the same provision in a section governing a different type of pension was deliberate). The court

---

[3] In its opposition brief, ECO cites Paragraph 21 of the complaint to suggest that it alleged that the Supply Agreement "describes H&B's obligation to develop" the die for ECO. (Pl.'s Resp. at 5.) Paragraph 21 of the complaint states, in relevant part: "Under the supply agreement, H&B agreed to manufacture ECO's design exclusively for ECO. In addition, H&B agreed to develop a 'progressive die' for the New Product Design." (Compl. ¶ 21.) It is not clear whether the second sentence intends to allege that H&B's agreement to develop the die was "under the supply agreement." Even if it does, since the actual Supply Agreement does not contain any obligation for H&B to develop the die, the allegation would conflict with the actual terms of the contract. In that case, the language of the contract controls. *See Nat'l Football League Props., Inc. v. Dallas Cowboys Football Club*, 922 F.Supp. 849, 852 (S.D.N.Y. 1996) ("To the extent that the content of the contracts conflicts with allegations about those contracts made in the Complaint, the actual language of the contracts must control.").

therefore finds no obligation for H&B to develop and deliver the progressive die under the Supply Agreement.

H&B also argues that ECO failed to allege facts to suggest it adequately fulfilled its obligations under the contract. (Def.'s Br. at 16–17.) In other words, even if the Supply Agreement did require H&B to create and deliver the progressive die to ECO, H&B argues that ECO still fails to allege that ECO performed its obligations under the contract—namely, that it paid for the tooling. (*See id.*; Def.'s Reply at 6.) The court agrees. For ECO to plausibly allege a breach of the tooling provision, it would need to, at minimum, allege that it paid "in full in accordance with the payment terms described on Schedule B," (Supply Agreement ¶ 11), but was not given ownership of the tooling. ECO's failure to allege any attempted payment for the progressive die is fatal to its breach claim here.[4] *See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F.Supp.2d 344, 360 n.6 (S.D.N.Y. 2012) (collecting cases and explaining that "[c]ases dismissing breach of contract claims for failure to allege due performance have involved complaints that 'failed to make even a general allegation that plaintiff had performed its obligations under the contract'" (cleaned up)). Accordingly, the court finds that ECO failed to state a claim that H&B breached the Supply Agreement.

### C. Conversion (Count III)

ECO brings a claim for the tort of conversion under Virginia law. (Compl. ¶¶ 54–59.) ECO alleges that H&B wrongfully took, assumed authority over, and used ECO's New

---

[4] ECO argues in its opposition brief that H&B was obligated to submit invoices before ECO would submit payment. (Pl.'s Resp. at 6.) This argument is unpersuasive. In support of its argument, ECO cites Section 3 of the Supply Agreement. (*Id.*) But Section 3 applies to "the Goods," which are defined in Section 1 as "the goods described on Schedule A." (Supply Agreement ¶ 1, 3.) The progressive die is described on Schedule B, so Section 3 does not apply. (*Id.* at Schedule B.)

- 11 -

Product Design and other confidential information, depriving ECO of the economic benefits that would flow from them.  (*Id.* ¶¶ 56–57.)

In Virginia, conversion is the "wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession."  *See Johnson v. Westlake Flooring Co.*, 744 F.Supp.3d 622, 630 (E.D. Va. 2024).  To state a claim for conversion, ECO must sufficiently allege: (1) ownership or right to possession of the property at the time of conversion and (2) the wrongful exercise of dominion or control by H&B over ECO's property that deprived ECO of possession.  *See Shelton v. Marshall*, 724 F.Supp.3d 532, 545 (W.D. Va. 2024).

The parties primarily argue over nature of the allegedly converted property—whether it was tangible or intangible, and if the latter, whether it is the type of intangible property that may ground a claim for conversion under *Mackey v. McDannald*, 842 S.E.2d 379 (Va. 2020).  (*See, e.g.*, Def.'s Br. at 17–18; Pl.'s Resp. at 6–8; Def.'s Reply at 6–7.)  The court need not reach this question here, as ECO's claims are barred by Virginia's source-of-duty rule.

In Virginia, the law "draws a clear boundary between duties arising from contract and those sounding in tort."  *Allegheny Constr. Co., Inc. v. Town of Christiansburg*, 923 S.E.2d 743, 757 (Va. App. 2025).  Tort liability can only arise when a defendant violates a duty that is recognized at common law but is *independent* of its contractual relationship with the plaintiff.  *Id.* at 753 (citing *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 255–56 (Va. 2019)).  Here, ECO's conversion claim is essentially identical to its claim that H&B breached the NDA, and therefore separate tort liability cannot arise.  H&B's possession and use of the New Product Design and other confidential information was not "wrongful" until and unless it violated the NDA by improperly disclosing or misappropriating the designs and confidential information.

- 12 -

(*See* Def.'s Br. at 20.)   Because the conversion claim arises out of the exact same facts underlying the breach of contract claim (Count I), the conversion claim must be dismissed. *See Adair v. EQT Prod. Co.*, 320 F.R.D. 379, 419 (W.D. Va. 2017) ("[A] plaintiff cannot maintain a claim for conversion if the act of dominion exerted by the defendant was wrongful only because it breached the defendant's duty under a contract.").  A tort of conversion is not an appropriate vehicle to bring an inventorship correction or trade secret misappropriation claim. Accordingly, the court finds that ECO failed to state a claim for conversion.

### D. Fraud in the Inducement (Count IV)

Lastly, ECO alleges fraud in the inducement against H&B for inducing ECO to enter into the NDA and the Supply Agreement by making false representations that it never intended to perform.  (*See* Compl. ¶¶ 61–66.)  To state a claim for fraud in the inducement in Virginia, ECO must plead: "(1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by [ECO], and (6) resulting damage to [ECO]."  *Paragon Def. Sols., Inc. v. Jadcap Mach. Works, Inc.*, No 1:22-cv-01425, 2023 WL 4937393, at *2 (E.D. Va. July 10, 2023) (quoting *Signet Bank*, 166 F.3d at 628).  The parties do not dispute that ECO relied on H&B's representations in deciding to enter into a contract.

The court finds that ECO fails to allege sufficient facts to plausibly allege fraud in the inducement.  Plaintiffs bringing fraud allegations are subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(b).  *See Cozzarelli v. Inspire Pharms.*, 549 F.3d 618, 629 (4th Cir. 2008).  ECO's allegations as to this count are simply insufficient.  Not only do they not satisfy the pleading standard under Rule 9(b), but they would also fail to meet even the lower pleading standard under Rule 12(b)(6).  The complaint is devoid of any facts to suggest

- 13 -

that H&B made any representations "while knowing, at the time they were made, that the representations were false and that H&B did not intend to perform as promised." (Compl. ¶ 63.) Similarly, ECO does not allege a single fact to suggest H&B had any "intent to mislead ECO into entering into the agreements."[5] (*Id.* ¶ 64.) As H&B points out, "ECO's allegations are, in essence, that H&B entered into agreements with no intention of performing in accordance with those agreements." (Def.'s Br. at 21.) Without any factual support, such conclusory allegations cannot support a claim for fraud in the inducement. *See Blevins v. Booker*, No. 1:17-cv-00012, 2017 WL 2389720, at *7 ("Importantly, a claim for fraud in the inducement requires more than a mere allegation that the defendant failed to fulfill his promises under the contract . . . the plaintiff must allege facts demonstrating that the defendant, at the time the contract was entered into, never intended to abide by its terms."); *see also Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, No. 1:12-cv-00396, 2012 WL 3841416, at *6 (E.D. Va. Sept. 4, 2012) ("[T]he mere failure to perform is generally not evidence of a lack of intent to perform at the time the contract was formed."). Accordingly, the court finds that ECO failed to state a claim for fraud in the inducement.

---

[5] ECO argues in its opposition brief that H&B's lack of intent to perform is "proven by its immediate appropriation, patent filing, and failure to develop the tooling." (Pl.'s Resp. at 10.) Again, ECO cannot supplement the complaint through its briefing. *Townes Telecomms., Inc. v. Nat'l Telecomms. Coop. Ass'n*, 438 F.Supp.3d 646, 652 n.8 (E.D. Va. 2020) (citing *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)). And even if it could, merely pointing to H&B's conduct after contracting in conclusory fashion, without more, would not suffice to state a claim of fraud in the inducement.

### IV.  Conclusion

For the foregoing reasons, the court will grant in part and deny in part H&B's motion to dismiss, (Dkt. 13).  The court will deny the motion as to Count I and grant the motion as to Counts II, III, and IV, and will dismiss those claims without prejudice.

An appropriate Order will issue.

**ENTERED** this  6th  day of February, 2026.

_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE